MAURICE D. PESSAH (SBN: 275955)
*maurice@pessahgroup.com*
MICHAEL MORRIS-NUSSBAUM (SBN: 317146)
*mmnussbaum@pessahgroup.com*
SUMMER E. BENSON (SBN: 326398)
*sbenson@pessahgroup.com*
**PESSAH LAW GROUP, PC**
661 N. Harper Ave., Suite 208
Los Angeles, CA 90048
Tel. (310) 772-2261

STUART CHELIN (SBN: 320357)
*stuart@chelinlaw.com*
**CHELIN LAW FIRM**
1801 Century Park East, Suite 2500
Los Angeles, CA 90076
Tel. (310) 556-9664
*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| JOSH GOSSETT, JAMES LAPLANT, DANIELLE PERREAULT, MAURICE SCARBOROUGH, and SCOTT SCHILLER each individually, and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br>        v.<br><br>ROBINHOOD FINANCIAL, LLC, a Delaware limited liability company; ROBINHOOD SECURITIES, LLC, a Delaware limited liability company; ROBINHOOD MARKETS, INC., a Delaware Corporation; and DOES 1-10, inclusive,<br><br>        Defendants. | Case No.: 21-cv-00837-VAP-MRW<br><br>**FIRST AMENDED COMPLAINT CLASS ACTION FOR**<br>**(1)  BREACH OF CONTRACT;**<br>**(2)  BREACH OF IMPLIED TERMS AND COVENANTS;**<br>**(3)  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>**(4)  NEGLIGENCE;**<br>**(5)  BREACH OF FIDUCIARY DUTY;**<br>**(6)  FALSE PROMISE;**<br>**(7)  NEGLIGENT MISREPRESENTATION;**<br>**(8)  UNLAWFUL BUSINESS PRACTICES, [Cal. Bus. & Prof. C. §17200 *et seq.*];**<br>**(9)  VIOLATION OF SEC RULE 10B-5**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs JOSH GOSSETT, JAMES LAPLANT, DANIELLE PERREAULT, MAURICE SCARBOROUGH and SCOTT SCHILLER ("Plaintiffs"), on behalf of themselves and all those similarly situated, bring this class action complaint against Defendants, ROBINHOOD FINANCIAL, LLC, a Delaware limited liability company; ROBINHOOD SECURITIES, LLC, a Delaware limited liability company; ROBINHOOD MARKETS, INC., a Delaware Corporation (collectively referred to herein as "Defendants," "Robinhood," or the "Company"); and DOES 1-10, inclusive, based on the following allegations:

## NATURE OF THE ACTION

1.     Robinhood, famous as the champion of the small retail investor, is a multi-billion-dollar online brokerage which prides and markets itself on "democratizing finance for all." In a March 23, 2016 tweet, the company asserted what one would expect from the self-professed "Robin Hood" of retail trading: "Let the people trade." Robinhood's *raison d'etre* was to bring the advantages of market participation to millions of non-institutional, retail investors. Robinhood owes various contractual obligations to its clients. As a broker-dealer, Robinhood also owes its clients certain legal duties. These include the duty of reasonable care, loyalty, good faith and best execution. That is what Robinhood's clients expected and that is what they deserved. To be treated with the same good faith as institutional market players. However, on or about January 27, 2021, **Robinhood switched sides**.

2.     Indeed, the Company plunged into infamy when it deliberately, willfully and knowingly breached its duties to its clients in favor of other, competing interests. Acting against its defenseless clients, Robinhood wantonly brought the ability of millions of its clients to freely trade on its platform to a screeching and unceremonious halt.  This, despite the fact that Robinhood had sufficient knowledge and opportunity to forewarn its clients prior to the stock market's opening bell on the morning of January 28, 2021, and perhaps even sooner.

3.     By CEO Vladimir Tenev's own admission, his "operations team" was

contacted by the National Securities Clearing Corporation ("NSCC"), an "industry consortium" that, by using a combination of "factors" and its own "discretion," requested an immediate cash deposit of approximately $3 billion in order to allow trades of certain securities made over the app to be processed.  In an interview with Elon Musk on the newly minted social media app, Clubhouse, Mr. Tenev disclosed that Robinhood's eleventh-hour negotiations with the NSCC culminated in a decision whereby: (1) the Company would deposit $700 million (instead of the initially demanded $3 billion) as collateral to cover trades emanating from its online brokerage platform; and (2) certain securities (i.e., GME, AMC, NOK, etc.) would be marked "position closing only." About "one hour before market opening," the $700million was deposited, Tenev confirmed to an inquisitive Mr. Musk.

4.     Upon information and belief, Robinhood's actions immediately erased hundreds of millions of dollars in client gains (and opportunities for gains). Defendants' actions and omissions including, without limitation, their failure to notify, warn or disclose their "preemptive"[1] actions caused massive losses to Robinhood's clients and prevented them from mitigating significant losses as certain securities began to nosedive at a pace only understood and known to whomever had knowledge of the "closing position only" restriction known to Robinhood "one hour prior" to the market's opening.

5.     Indeed, Robinhood deliberately, willfully and knowingly disabled the "buy" function for any investor on its app who attempted to trade the following stocks or derivatives thereof: GameStop ("GME"), AMC Entertainment Holdings, Inc. ("AMC"), BlackBerry Ltd. ("BB"), Nokia ("NOK") and American Airlines ("AAL") among others. Collectively, GME, AMC, BB, NOK and AAL shall be referred to as, the "Securities." Options involving the Securities, shall be referred to as the "Derivatives."

---

[1] This is a quote from Mr. Tenev's now infamous January 28, 2021 interview on CNBC's *Squawk Box*.

FIRST AMENDED CLASS ACTION COMPLAINT

6.    In addition to being incredibly damaging to millions of its retail investor clients, Robinhood's actions were diametrical to Robinhood's advertised selling point of "democratizing finance" for all. Robinhood knew, or reasonably should have known, that the effect of its actions would be inimical to the interests of its clients. Worse still, the Company, which, in return for money, sends well over half (approx. 65%) of its "order flow"[2] to Citadel Securities, an affiliate of powerhouse hedge fund Citadel, LLC ("Citadel"), knew of the benefit that Citadel stood to gain from the "closing position only" restrictions. Upon information and belief, Citadel either held short positions in all or some of the Securities, and/or held significant interests in certain companies with short positions in the Securities.  Upon information and belief, the financial interests of the presumptive constituents of Robinhood's financial "democracy," were sacrificed in favor of large institutions and Robinhood's own interests.

7.    A significant number of retail investors who relied on Robinhood to be their champion, and who entrusted their trades to Defendants, were told that "ongoing volatility" was the reason for the sudden suspension of certain basic and crucial account trading functions.

8.    Robinhood's CEO, Vladimir Tenev, rushed to hold a damage control interview on CNBC, during which he averred that Robinhood's sudden trading restrictions were "preemptive."  Mr. Tenev then followed up by assuring the public that Robinhood had no liquidity problems. Later Mr. Tenev changed the story and claimed that a regulatory call to increase cash deposits (which Robinhood was unable or unwilling to fulfill) had caused the need for the restrictions. Robinhood then proceeded to raise $3.4 billion in under a week, demonstrating an ability to raise whatever cash it needs to keep its business going, including to make any requested deposits with NSCC. Notwithstanding Mr. Tenev's equivocations, it is clear that massive amounts of damage were incurred by Robinhood clients who were left in the dark about why their ability

---

[2] Plaintiffs' trade orders.

FIRST AMENDED CLASS ACTION COMPLAINT

to trade in their chosen investments had been "pre-emptively" suspended, without any warning and by the very entity entrusted to facilitate and process their trades.

## **PARTIES**

9. At all times herein mentioned, Plaintiff JOSH GOSSETT was and is an individual residing in Los Angeles, California.

10. At all times herein mentioned, Plaintiff JAMES LAPLANT was and is an individual residing in San Francisco, California.

11. At all times herein mentioned, Plaintiff DANIELLE PERREAULT was and is an individual residing in the State of Maine.

12. At all times herein mentioned, Plaintiff MAURICE SCARBOROUGH was and is an individual residing in Los Angeles, California.

13. At all times herein mentioned, Plaintiff SCOTT SCHILLER was and is an individual residing in Los Angeles, California.

14. Plaintiffs are informed and believe, and based thereon allege, that Defendant ROBINHOOD FINANCIAL, LLC, is, and at all times herein mentioned was, a Delaware limited liability company, with its principal place of business located at 85 Willow Road, Menlo Park, California 94025.

15. Plaintiffs are informed and believe, and based thereon allege, that Defendant ROBINHOOD SECURITIES, LLC, is, and at all times herein mentioned was, a Delaware limited liability company, with its principal place of business located at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746.

16. Plaintiffs are informed and believe, and based thereon allege, that Defendant ROBINHOOD MARKETS, INC., is, and at all times herein mentioned was, a Delaware corporation, with its principal place of business located at 85 Willow Road, Menlo Park, California 94025.

17. Defendants Does 1 through 10 , inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to Plaintiffs. When their true names and capacities are ascertained, Plaintiffs will amend this complaint by inserting

FIRST AMENDED CLASS ACTION COMPLAINT

their true names and capacities herein. Plaintiffs are informed and believe, and based thereon allege, that each of the fictitiously named defendants is the agent, servant, employee, representative, partner, and/or joint venturer of their co-defendants, and so ratifies all of their acts and conduct. Therefore, each Doe Defendant is responsible in some manner for the occurrences herein alleged, and Plaintiffs' damages as herein alleged were proximately caused by said Defendants.

18.     At all relevant times, each Defendant was the agent of the other Defendants and was at all times acting within the purpose and scope of such agency. Moreover, in committing the acts and omissions asserted herein, Defendants, and each of them, were acting in concert together, in the course and scope of their respective relationship with each other, whether as employees, agents, representatives, independent contractors, providers, service providers, as agents or representatives of each other, respectively, or as joint venturers, co-conspirators or otherwise.

## JURISDICTION

19.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate claims of all members of the proposed Class and are in excess of $5,000,000, exclusive of interest and costs, and there are more than one hundred (100) putative class members. Further, several members of the putative class are citizens of a state different from Defendants.

## VENUE

20.     Venue is proper pursuant to 28 U.S.C. §1391(b) because, on information and belief, a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and Plaintiffs' cause of action arose in this district.

## CLASS ACTION ALLEGATIONS

21.     Plaintiffs bring claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the Class as follows:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**All Robinhood clients and/or users within the United States who held positions and/or were unable to execute any trade(s) of the Securities or the Derivatives on or after January 28, 2021, and who were harmed by Robinhood's actions to bar or otherwise restrict trading of the same.**

22.     Explicitly excluded from the Class are: (i) Robinhood entities and their current officers, agents and employees; (ii) counsel for either party; and (iii) the Court and its personnel presiding over this action.

23.     **Numerosity/Impracticability of Joinder**: The precise number of members of the proposed Class is unknown to Plaintiffs at this time. However, Plaintiffs are informed and believe, and based thereon allege, that the members of the Class are so numerous that joinder of all members would be impractical and unfeasible. Plaintiffs are informed and believe, and based thereon allege, that there are hundreds of thousands of persons (if not more) within the Class. All members may be notified of the pendency of this action by reference to Defendants' records, or via alternative means.

24.     **Commonality and Predominance**: There are questions of law and fact that are common to the claims of Plaintiffs and members of the proposed Class. These common questions of law and fact exist as to all Class members and predominate any questions affecting only individual members. Common questions of law and fact, include, but are not limited to, the following:

(a)   Whether Defendants breached their agreement with Named Plaintiffs and the Class to permit trading of the Securities on the Defendants' platform;

(b)   Whether Defendants' conduct unfairly divested Named Plaintiffs and the Class of the benefit of their agreement with the Defendants;

(c)   Whether Defendants breached their duty to Named Plaintiffs and the Class to diligently execute or permit reasonable trading requests;

(d)   Whether Defendants failed to meet their duty of care when they wantonly, and without justification or notice, disabled certain trading privileges of

7

FIRST AMENDED CLASS ACTION COMPLAINT

the Named Plaintiffs and the Class;

(e)  Whether Defendants intentionally, and without justification or notice, restricted certain abilities of Named Plaintiffs and the Class to freely participate in the trading of the Securities, thereby causing Named Plaintiffs and the Class to suffer damages;

(f)  Whether Defendants violated Financial Industry Regulator Authority (FINRA) Rule, 5310;

(g)  Whether Defendants breached their fiduciary duties to Named Plaintiffs and the Class;

(h)  Whether Defendants made a false promise to the Named Plaintiffs and to the Class regarding the continuing ability to trade in the Securities which was relied upon to the detriment of the Named Plaintiffs and the Class.

(i)  Whether Defendants engaged in unlawful business practices in violation of Cal. Bus. & Prof. Code § 17200;

(j)  Whether Defendants' conduct violated SEC Rule 10b-5;

(k)  Whether Named Plaintiffs and the Class were injured as a result of Defendants' conduct.

25.  **Typicality**: Plaintiffs' claims are typical of the claims of the members of the proposed Class. All members of the proposed Class have been injured by Defendants' unlawful conduct. Plaintiffs' claims arise from the same practices and course of conduct giving rise to the claims of the members of the proposed Class. Plaintiffs will fairly and adequately represent the interest of the proposed Class because Plaintiffs are members of the proposed Class and do not have an interest that is contrary to or in conflict with those members. There is a well-defined community of interest in the questions of law and fact affecting the class of persons that Plaintiffs represent as a whole. Plaintiffs were unable to trade the Securities and the Derivatives as a result of Defendants' unlawful conduct and sustained damages as a result.

26.  **Superiority**: A class action is superior to any other form of action for the

8

fair and efficient adjudication of this lawsuit. Individual consumers such as Plaintiffs have a difficult time prosecuting an individual action against large corporations like Defendants. Even if any class member could afford individual litigation against Defendants, it would be unduly burdensome to the court system. Individual litigation of such numerous claims magnifies the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management obstacles and affords the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court. A class action will promote judicial economy and parity among the claims of the individual class members, as well as judicial consistency. Notice of the pendency and any resolution of this action can be efficiently provided to class members by mail, print, broadcast, internet, and/or multimedia publication. Requiring each class member to both establish individual liability and pursue an individual remedy would discourage the assertion of lawful claims by customers who would be disinclined to pursue an action against a corporate defendant like Robinhood. Proof of a common business practice or factual pattern, of which the Plaintiffs experienced, is representative of the proposed Class and will establish the right of each of the members of the proposed Class to relief on the claims alleged herein.

27.     Prosecution of separate actions by individual members of the proposed Class would create a substantial risk of inconsistent or varying adjudications, which may produce incompatible standards of conduct for Defendants. Prosecution of separate actions by individual members of the proposed Class would create a risk of adjudications with respect to individual members which may, as a practical matter, be dispositive of the interest of other members not parties to the adjudication or substantially impair or impede their ability to protect their interest. Further, the individual claims are not sufficiently large to warrant vigorous individual prosecution given the concomitant costs and expenses attending thereto. This class action presents no material difficulties in management.

9

28.     **Adequacy of Representation**: Plaintiffs are representatives who will fully and adequately assert and protect the interest of the Class and have retained competent counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Class.

29.     Plaintiffs request permission to amend the complaint to include other individuals as class representatives in the event any named Plaintiff is deemed an inadequate representative of the Class. Plaintiffs further request permission to amend the Complaint to revise the Class definition as appropriate following discovery.

30.     California is the proper and desirable forum for the claims made against Robinhood herein. Robinhood is based in California and its customer agreement (the "Customer Agreement") specifies California law as governing. In particular the Customer Agreement provides that "all transactions made in My account shall be governed by the laws of the State of California regardless of the choice of law rules thereof)…" Therefore, each contract-based claim brought against Robinhood herein must be governed by California law and appropriately brought in this State and before this Court. Further, any tort-based claims, even if determined to be outside the scope of the governing law provision of the Customer Agreement, can be adequately and appropriately adjudicated, with adequate and appropriate remedies to Plaintiffs and each member of the Class.

## GENERAL ALLEGATIONS

31.     Plaintiffs hereby incorporate by reference Paragraphs 1 through 30 of this Complaint as though fully set forth herein.

### I.     ROBINHOOD'S BUSINESS AND EXPERTISE IN THE SECURITIES MARKET

32.     Robinhood is a multi-billion-dollar online brokerage firm that promotes and offers its brokerage services to the general public. The Company's services are accessible via its web-based platform and mobile application (the "App").

33.     At least two characteristics make Robinhood distinctive. The first is its

FIRST AMENDED CLASS ACTION COMPLAINT

promise not to charge a commission on trades (free trading). The second is the accessibility to margin and other riskier methods of trading (options trading, etc.) typically reserved for experienced high net worth investors, that it markets and in fact offers to everyday retail investors.

34.     Robinhood is a highly sophisticated participant in the market for stocks and derivatives and possesses a high degree of understanding, knowledge, experience and expertise about the workings of that market including, without limitation, the clearing and settlement of trades.

35.     Indeed, after approximately two years in development, Robinhood launched its own proprietary clearing system, which it claimed was "the only system built from scratch on modern technology in the last decade." In about October 2018, Robinhood publicly released statement, the Company represented that it had built the clearing system:

> "[i]n order to move faster and offer more financial services to you, we realized we had to build our own clearing system—a core piece of infrastructure for brokerages—instead of relying on a third party."

Further, Robinhood advised that its new and improved clearing practices would help "welcome      millions      of      more      people      to      the      financial      system."(*See* https://blog.robinhood.com/news/2018/10/9/introducing-clearing-by-robinhood; last accessed February 2, 2021) Robinhood also represented to its clients that, in light of its status as a "clearing broker," it had "complete control over giving you the best experience out there!" (*Id.*) Robinhood boasted that its new clearing system gave it "more account and trade information" and thus an ability to offer "better customer support" and "quicker responses."

36.     Robinhood makes a significant amount of its revenues and profits from, among other sources, (i) payments of rebates on a per-transaction basis from middle-men (known as market makers) through whom Robinhood routes trades or "order flow", (ii)  selling its clients' trading and other data  to large institutions such as hedge

FIRST AMENDED CLASS ACTION COMPLAINT

funds and others, (iii) uninvested cash in client accounts, and (iv) charging its clients fees for upgraded and/or expanded services on the Robinhood platform.

37.     Thus, Robinhood directly benefits from the increased use of, and trading on, its platform as the more cash that clients maintain in their accounts and the more trading that occurs, the more revenue will be generated through the above-mentioned, and other, revenue channels. This is a fundamental component of Robinhood's business model. Indeed, high volume trading on its platform is of great benefit to Robinhood. The more trading that occurs, the more money Robinhood earns. Upon information and belief, Robinhood earned approximately $180 million in revenues in the second quarter of 2020 alone from its lucrative rebate business.

38.     As such, Robinhood's objective is to gain as many clients, or users, as it can. As Robinhood states on its website, www.robinhood.com (the "Site"), it is "on a mission to democratize finance **for all**" and believes "the financial system should be built to work **for everyone**." (https://robinhood.com/us/en/support/articles/our-mission/; last accessed February 2, 2021) (emphasis added)

39.     In furtherance of gaining as many clients as possible, Robinhood offers investments in fractional shares and the concomitant enticement of investing "in thousands of stocks for as little as $1."

40.     Robinhood has been extremely successful in inducing a vast amount of retail investors to use its platform and become clients. The one thing Robinhood neither advertises nor draws any attention to whatsoever are the unconscionable terms and conditions in the Customer Agreement, or the illusory nature of any Robinhood obligations thereunder.

41.     Upon information and belief, Robinhood has more than 13 million clients who use its brokerage services, a significant portion of whom are unsophisticated stock market investors.   According to the company, "[m]ore than half of Robinhood customers are opening their first brokerage account, and the median customer age is 31

FIRST AMENDED CLASS ACTION COMPLAINT

years old."[3]

42.     Upon information and belief, Robinhood has had, and is required to have, extensive dealings and involvement with the National Securities Clearing Corporation ("NSCC").

43.     Upon information and belief, at all material times prior to January 28, 2021, Robinhood was aware that the an important and crucial component for successful and continued operation of its business and ability to provide services to its massive clientele involved the following mechanisms and factors: (i) that trades made on its platform were ultimately cleared financially through NSCC, (ii) that Robinhood was required to post collateral with NSCC to guarantee that there would be settlement of the trades made through Robinhood's brokerage business, (iii) that Robinhood is or can be subject to calls for increased collateral from NSCC, and (iv) that there are a variety of factors which will cause NSCC to demand that Robinhood increase its collateral, including, without limitation, trading risk and volatility, in accordance with risk formulas used by NSCC and at the discretion of NSCC.

44.     Moreover, upon information and belief, at all material times prior to January 28, 2021, Robinhood was aware, or had a basic understanding, of (i) the amount of collateral it had on deposit with NSCC, (ii) the various market situations which would or could precipitate an increase in NSCC imposed collateral requirements, and (iii) the formulas and criteria upon which NSCC relied when making a decision to demand increased collateral from Robinhood.

45.     As was known to Robinhood, in the event that Robinhood is required to increase its collateral with NSCC, this operates against the financial interests of Robinhood because it will have  more money at risk in the event that the collateral must be used and because it costs Robinhood to raise the additional collateral either because it must draw on its credit lines, route monies from other investments or offer incentives

---

[3]     https://www.cnbc.com/2020/06/17/robinhood-drives-retail-trading-renaissance-during-markets-wild-ride.html#:~:text=More%20than%20half%20of%20Robinhood,old%2C%20according%20to%20the%20company

13

FIRST AMENDED CLASS ACTION COMPLAINT

to investors to invest in Robinhood in order to raise the additional funds.

46.     When Robinhood began using its own clearing services, it ceased using the services of its former clearing broker, Apex Clearing Corporation ("Apex"). Upon information and belief, Apex had in excess of $4.3 billion in cash and securities segregated and deposited for regulatory purposes, as disclosed in its 2019 Financial Statements and Supplemental Schedules. In contrast, and based on information and belief, when Robinhood switched to become a clearing broker and ceased using Apex's services, Robinhood only maintained approximately $300 million on deposit with NSCC. Robinhood and failed to disclose this drastic reduction in its necessary collateral deposits, and the risks associated therewith, to its clients.

47.     Robinhood is also a FINRA regulated broker-dealer and is a FINRA member. As a FINRA regulated broker-dealer, Robinhood, and the terms of its Agreement, are subject to FINRA Rule 5310, which provides in part that in "any transaction for or with a customer or a customer of another broker-dealer, a member and persons associated with a member shall use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions".

## II.     ROBINHOOD MARKETS ITSELF AND ACTS AS AN INVESTMENT RESOURCE AND TRUSTED FIDUCIARY TO ITS CLIENTS

48.     Robinhood is an online brokerage and relies heavily and primarily on the Site to market, promote and explain its services, as well as to solicit potential clients. The more clients, the better.

49.     Upon information and belief, the very name "Robinhood" was carefully and purposely chosen by Robinhood to evoke the image and characteristics of the mythical "Robin Hood," archetypal champion and protector of the interests of the everyday citizen, or, in Robinhood's case, its clients who are the everyday investor.

50.     Robinhood represents on the Site that every "time you place a trade, **your**

FIRST AMENDED CLASS ACTION COMPLAINT

1    **trust is in our hands**". (*See* https://robinhood.com/us/en/about-us/our-execution-
2    quality/; last accessed Feb. 2, 2021) (emphasis added)

3         51.    Robinhood provides resources which it describes as the "building blocks
4    of your financial journey" and what "you **need to know** about investing." The purpose
5    of these resources is obviously to prompt new client engagement and conversion, since
6    the "sign up" button is conveniently and ubiquitously located on each and every page
7    of the Site, sometimes multiple times.



(https://learn.robinhood.com/articles/1hr6ec2LQfbMQNlTGJSNVI/what-is-fiduciary-
duty/; last accessed February 2, 2021)

FIRST AMENDED CLASS ACTION COMPLAINT



(https://learn.robinhood.com/articles/1hr6ec2LQfbMQNlTGJSNVI/what-is-fiduciary-duty/)

52.     Robinhood's marketing is simply masquerading as seemingly neutral literature designed to help retail investors understand the market, and the duties of brokers who facilitate trades thereon.  Topics such as "what is a fiduciary duty," the benefits of being diversified and considerations for navigating the ins and outs of market volatility are consistently and deliberately combined with offers to receive "free stock" and "sign up" to the App.

53.     Importantly, Robinhood provides a lengthy explanation of fiduciary duties on the Site. That explanation includes explicitly explaining that "a fiduciary duty is a legal and ethical responsibility that certain individuals have to act in the best interests of the clients….they serve" and includes a duty of care and of loyalty "to put the interests of a client ahead of" the fiduciary's interests. Other examples included on the

FIRST AMENDED CLASS ACTION COMPLAINT

1  Site (of course never without the "sign up" button out of reach) are the duty of good

2  faith and the duty of disclosure, which requires being "fully transparent with clients."

3      54.    After Robinhood's analysis of the role of a fiduciary and repeated

4  solicitation of clients amidst that discussion, Robinhood presents a link to another

5  Robinhood created resource entitled "What is a Financial Advisor?" According to that

6  learning resource, Robinhood explains that different "types of financial advisors

7  include Certified Financial Planners, accountants, attorneys, brokers, and investment

8  advisors." The word brokers is highlighted in the passage and can be contains a click

9  through link where users are directed to a Robinhood authored article entitled "What is

10  a Broker?".

11      55.    The "What is a Broker" article states clearly that there "are dozens of

12  brokerage firms in the US. **You've got Robinhood (of course)** as well as others like

13  Charles Schwab, E* Trade, and Fidelity….."

14  (https://learn.robinhood.com/articles/3AalDDtYuWx4fp46eEZpxq/what-is-a-broker/;

15  last accessed Feb. 2, 2021) (emphasis added)

16

17

18

19

20

21

22

23

24

25

26

27

28



FIRST AMENDED CLASS ACTION COMPLAINT

56.     Remarkably, at no point in the voluminous materials presented by Robinhood, which are specifically designed to attract potential clients to the Site and the App, does the Company ever assert that it is **not** a fiduciary or does not owe fiduciary duties to its clients, despite explaining that it is a broker which is a type of financial advisor which often automatically gives rise to fiduciary status. Moreover, none of the onerous and unconscionable terms of the Agreement are, in any conspicuous manner, mentioned amidst the panoply of other information designed to draw new clients to trade on the App.

57.     Further, Robinhood entices new clients with an offer of free stock. Fulfilling the free stock offer is one of the first actions that Robinhood performs on behalf of new clients. The free stock is selected from a basket of stocks chosen by Robinhood and not the clients.

58.     As well, Robinhood offers other services on the App, such as cash management similar to banking, which is another traditional relationship understood to give rise to fiduciary duties.

III.    **ROBINHOOD WATCHES AND BENEFITS FROM A SIGNIFICANT RISE IN TRADING AND VOLATILTIY IN PARTICULAR STOCKS**

59.     Commencing in January 2021 and until the morning of January 28, 2021, Robinhood permitted its clients to take, often risky, positions in the Securities and the Derivatives. Upon information and belief, significant numbers of Robinhood clients took positions in the Securities and the Derivatives.

60.     Upon information and belief, Robinhood was aware of the increased interest and trading in the Securities and the Derivatives both from its own internal ability to process and analyze this data, and because of the robust and pervasive discussion and speculation in the media and other social media outlets, such as Reddit. During his January 28, 2021 interview on CNBC's *Squawk Box*, Mr. Tenev acknowledged that the App was "No. 1 on the [Apple] App Store," which was yet another indication that Defendants were positioned to anticipate the high volume of

trading being conducted on the App and, in particular, in the Securities and the Derivatives. The notion that Robinhood had no way to predict the increased trading activity of its clients with respect to the Securities or the Derivatives is as disingenuous as it is far-fetched. Robinhood abandoned its clients' interest, and its duties to them, when it "pre-emptively" and deliberately restricted and disrupted trading on the App in such a way that even someone with the most basic understanding of the markets would know to be detrimental to Plaintiffs' interests. A "position closing only" restriction on its clients was the most obvious way to artificially depress and otherwise manipulate the price of the Securities and the Derivatives.

61.     Significantly, it was well publicized and known to Robinhood that a primary driver of activity among its clients in taking positions involving the Securities and the Derivatives was to pursue a "short squeeze" strategy whereby the holders of extremely large short positions in a stock are forced to compete in the market for shares in order to close their short positions and minimize losses, thereby rapidly raising the prices of those stocks.

62.     Upon information and belief, Robinhood was aware that the volatility in the Securities was a risk to its clients who had taken positions involving the Securities. On the Site, Robinhood advised its clients that in volatile markets "Short-term investors might perceive volatility as a potential risk" and that how its clients approached risk "depends on your financial portfolio, what information you trust, and how you interpret your findings."

63.     Further upon information and belief, Robinhood's clients taking positions involving the Securities and the Derivatives was an important and contributing factor to the rise in the value of the Securities, and this was fully known to, and understood by, Robinhood.

64.     Indeed, Robinhood was aware at all material times, including as of January 28, 2021 that (i) a significant number of its clients were taking positions involving the Securities and the Derivatives, (ii) there was a very high volume of

trading in positions in the Securities and the Derivatives being undertaken by Robinhood's clients through their Robinhood accounts on Robinhood's platform, (iii) the trading by Robinhood's clients in their positions involving the Securities and Derivatives was having a significant impact on value of, volume of trading of, positions in, and overall market interest in the Securities and the Derivatives, and on the volatility of the foregoing, and (iv) trading in the Securities and the Derivatives could be subject to time-sensitive circumstances requiring the ability to execute trades quickly in order to realize profits or minimize losses, especially in light of the increased volatility in the Securities.

65.     Plaintiffs took positions in the Securities and the Derivatives through their Robinhood accounts until the morning of January 28, 2021 in reliance (i) on the fact that they could continue to freely manage their holdings and make investment and divestment decisions in relation thereto in the manner that they determined was in their best interests and by using the Robinhood platform to timely engage in the market to execute their trading, and (ii) the fact that Robinhood had organized and arranged its business and affairs, including without limitation its financial affairs, such that the high volumes and volatility of the trading in the Securities and the Derivatives would not be an impediment to Robinhood executing trading orders or having trades made on its platform cleared.

66.     Upon information and belief, Robinhood benefitted significantly from the high volume of trading activity in the Securities and the Derivatives by its clients, who were relying on the continued full functionality of trading choices through the Robinhood platform and the stability of Robinhood's business, as this high trading volume generated significant amounts of rebates and client trading data that Robinhood would be able to sell.

IV.     **ROBINHOOD KNEW OR OUGHT TO HAVE KNOWN THAT IT MAY BE REQUIRED TO, OR WOULD, RESTRICT TRADING IN THE SECURITIES, YET IT NEVERTHELESS ALLOWED**

FIRST AMENDED CLASS ACTION COMPLAINT

1

2

**TRADING TO CONTINUE BEFORE ABRUPTLY RESTRICTING PLAINTIFFS' ACCOUNTS WITHOUT NOTICE**

3

4

5

6

7

8

9

67.     Prior to January 28, 2021, the exact particulars of which are known to Robinhood and unknown to the Plaintiffs, Robinhood became aware that the volume and volatility of trading in the Securities and the Derivatives by its clients would, or would likely, result in NSCC requiring Robinhood to dramatically increase its collateral deposits with NSCC in order for trades of the Securities and the Derivatives to continue through Robinhood's brokerage. Robinhood failed to give any notice or warning to its clients, including without limitation the Plaintiffs, of the foregoing.

10

11

12

13

14

15

16

68.     Further, or in the alternative, prior to January 28, 2021, in all the circumstances as pleaded herein, Robinhood reasonably ought to have been aware that the volume and volatility of trading in the Securities and the Derivatives by its clients would, or would likely, result in NSCC requiring Robinhood to dramatically increase its collateral deposits with NSCC in order for trades in the Securities and the Derivatives to continue. Robinhood failed to give any notice or warning to its clients, including without limitation the Plaintiffs, of the foregoing.

17

18

19

20

21

22

69.     In any event, Robinhood has averred that early in the morning of January 28, 2021, prior to the market for trading or taking positions in the Securities opening, NSCC informed Robinhood that it was immediately required to significantly raise the amount of its collateral deposit with NSCC in order to continue settling trades and other positions by Robinhood's clients.  Robinhood failed to give any notice or warning to its clients including, without limitation, the Plaintiffs, of the foregoing.

23

24

25

26

27

28

70.     Based on information and belief, Robinhood was unable to provide the initial collateral deposit required by NSCC. Upon information and belief, Robinhood negotiated the collateral requirement to $700 million (from $3 billion) and decided to mark the Securities "position closing only," effectively barring Plaintiffs from buying, or otherwise trading, the Securities and/or the Derivatives other than to allow a liquidation of their positions in the Securities. This "position closing only" restriction,

21

although known to Robinhood prior to the opening bell on January 28, 2021, was not announced to Plaintiffs. Rather, approximately one hour into the trading day, Robinhood barred its clients including, without limitation, the Plaintiffs, from using its services to buy, or otherwise trade, in the Securities or the Derivatives, other than to sell their Securities and liquidate their accounts of the Securities. Further on January 28, 2021, Robinhood removed the Securities from its platform such that they were unavailable, and did not appear, to its clients even though the Securities are publicly traded companies.

71.     The steps taken by Robinhood as described in paragraph 70 above are hereinafter referred to as the "Robinhood Trading Restrictions"

72.     Robinhood imposed the Robinhood Trading Restrictions without providing any advance notice to its clients, including without limitation the Plaintiffs, that it would be taking these steps.

73.     After January 28, 2021, Robinhood modified, and continued to keep in place, strict restrictions on, at least, the Securities, and in particular, imposed severely low ceilings that each client, including without limitation the Plaintiffs, could purchase of each of the Securities ("Modified Trading Restrictions").

### *Named Plaintiff LaPlant's Experience*

74.     On the morning of January 28, 2021, Mr. LaPlant attempted to purchase stock in each of GME, AMC, and BB through the Robinhood platform. However, Mr. LaPlant, through no fault of his own, was prohibited from doing so by Robinhood.

75.     Each time Mr. LaPlant attempted to purchase the above-referenced stocks, he received a notification from Robinhood stating, "You can close out your position in this stock, but you cannot purchase additional shares." Mr. LaPlant, who was not given any notice or warning, was effectively divested of certain critical trading functions typically available through his Robinhood trading account including without limitation, being divested of the ability to purchase shares of GME, AMC or BB.

FIRST AMENDED CLASS ACTION COMPLAINT

1

2          ***Named Plaintiff Gossett's Experience***

3          76.     On the morning of January 28, 2021, Mr. Gossett accessed his Robinhood

4    account to place an order for GME and AMC. However, Mr. Gossett found that he was

5    prevented by Robinhood from purchasing additional stock in these companies for his

6    account. Mr. Gossett, like Mr. LaPlant, received a notification that he could only "close

7    [his] position in this stock[.]" Mr. Gossett, who was not given any notice or warning,

8    was also effectively divested of certain critical trading functions typically available

9    through his Robinhood trading account, including without limitation, being divested of

10   the ability to purchase shares of GME and AMC.

11         ***Named Plaintiff Perreault's Experience***

12         77.     On January 27, 2021, Ms. Perreault purchased shares of GME and NOK.

13   On the morning of January 28, 2021, Ms. Perreault attempted to purchase additional

14   shares of GME, as well as shares of AMC. However, Ms. Perreault was prevented from

15   making these purchases, without warning or notice, by the Robinhood app.

16         78.     Ms. Perreault saw the value of her Securities holdings plummet in a matter

17   of minutes as a result of Robinhood's actions. Worse yet, Ms. Perreault was unable to

18   mitigate her losses by buying additional Securities at the depressed prices. As a result

19   of Robinhood's trading restrictions, Ms. Perreault suffered losses and lost out on

20   significant earnings opportunities.

21         ***Named Plaintiff Scarborough's Experience***

22         79.     Prior to January 28, 2021, Mr. Scarborough owned call option contracts

23   for NOK and AMC, as well as shares of AMC and GME.

24         80.     On January 28, 2021, Mr. Scarborough attempted to purchase shares of

25   GME, AMC, and NOK through his Robinhood app. Yet, Mr. Scarborough, like other

26   similarly situated, received a notification informing him that he could not purchase

27   shares of these stocks.

28         81.     Additionally, Mr. Scarborough attempted to purchase additional options

FIRST AMENDED CLASS ACTION COMPLAINT

contracts for NOK stock on January 28, 2021. However, when he attempted to do so, he received a notification advising that "This stock is not supported on Robinhood."

82.   Mr. Scarborough was therefore forced to watch the value of his Securities and Derivatives fall while being unable to mitigate his losses by buying additional shares and options at the depressed prices. Mr. Scarborough suffered losses as a result of Robinhood's actions and lost out on additional earnings opportunities.

### *Named Plaintiff Schiller's Experience*

83.   On January 28, 2021, owned approximately 108 call option contracts in American Airlines (AAL). On said date, Schiller, a Robinhood client, was unable to effectuate trades on or for AAL. Moreover, Mr. Schiller was unable to even look up AAL via the Robinhood Ap, as the ticker symbol was totally unavailable on Robinhood's platform thereby prohibiting Mr. Schiller from effectuating trades on or relating to the positions he held in AAL.

84.   Mr. Scarborough suffered losses as a result of Robinhood's actions and lost out on additional earnings opportunities.

V.   **ROBINHOOD'S FAILURE TO PROVIDE NOTICE OR WARNING AND ITS UNILATERAL RESTRICTIONS SEVERELY DAMAGED ITS CLIENTS AND THE MARKET FOR AND VALUE OF THE SECURITIES**

85.   Robinhood imposed the Robinhood Trading Restrictions, and has continued with the Modified Robinhood Trading Restrictions, with the willful, specific and deliberate intention of negatively affecting the market for the Securities and the Derivatives in order to dramatically deflate and depress the price and value of the Securities and the Derivatives.

86.   Further, or in the alternative, Robinhood imposed the Robinhood Trading Restrictions, and continued operating with the Modified Robinhood Trading Restrictions when it was aware, or reasonably ought to have been aware, that those steps would negatively affect the market for the Securities and the Derivatives and would dramatically deflate and depress the price and value of the Securities and the

FIRST AMENDED CLASS ACTION COMPLAINT

Derivatives.

87.   Further, when Robinhood imposed the Robinhood Trading Restrictions, vast amounts of Robinhood clients including, without limitation, the Plaintiffs, attempted to take positions, or increase their positions, in the Securities and the Derivatives, leading to a near term increase in their value. Upon information and belief, including that such imminent trading in the Securities and the Derivatives was publicly discussed on various, well-known and widely publicized investor forums and groups on the internet, Robinhood was aware of the imminent trading in the Securities and the Derivatives that was about to occur.

88.   Commencing on or about January 28, 2021, there was a precipitous and dramatic fall in the value of the Securities and the Derivatives.

89.   The imposition of the Robinhood Trading Restrictions and the Modified Robinhood Trading Restrictions by Robinhood caused and contributed to the precipitous and dramatic fall in the value of the Securities and the Derivatives.

90.   As a result of Robinhood's imposition of the Robinhood Trading Restrictions and continuation with the Modified Robinhood Trading Restrictions, Robinhood's clients who owned the Securities and the Derivatives were significantly harmed as the value of those positions and holdings steeply declined.

91.   As a result of Robinhood's imposition of the Robinhood Trading Restrictions and continuation with the Modified Robinhood Trading Restrictions, Robinhood's clients were harmed in their ability to use the full functionality of their accounts to freely trade in the Securities and the Derivatives in such fashion as they deemed fit in order to mitigate the losses they were experiencing as a result of the fall, and continuing fall, in the value of their Securities and their Derivatives.

92.   As a result of Robinhood's imposition of the Robinhood Trading Restrictions and continuation with the Modified Robinhood Trading Restrictions, Robinhood's clients who intended to purchase any of the Securities and/or the Derivatives were significantly harmed and lost earning opportunities in the event that

the price of any of the Securities or the Derivatives rises.

93.     As a result of Robinhood's imposition of the Robinhood Trading Restrictions and continuation with the Modified Robinhood Trading Restrictions, Robinhood's clients who intended to take "short" positions in any of the Securities were unable to do so and were harmed and lost earning opportunities in the event that the price of any of the Securities falls.

94.     As a result of Robinhood's imposition of the Robinhood Trading Restrictions and continuation with the Modified Robinhood Trading Restrictions, Robinhood's clients were forced and/or influenced to take and suffer losses, rather than potentially suffer greater losses, by selling Securities and otherwise in respect of their Derivatives in the face of downward spiraling prices of the Securities and the Derivatives due to the actions taken by Robinhood and the dramatic effect of those actions on the market for the Securities and the Derivatives.

95.     Further, Robinhood's failure to provide notice to, or warn, Plaintiffs of any of the matters referred to hereinabove, caused damage to Plaintiffs in that they continued to trade and take other positions in the Securities and the Derivatives, and, as a result, suffered losses and damages as described above.  Moreover, Plaintiffs were prevented from taking any steps to prevent or mitigate the loss and damage that was caused, or was going to be caused, including without limitation by making strategic and timely arrangements to deal with their Robinhood accounts and trade and take positions with other brokers who were still permitting free trading such that the damage to the market for and value of the Securities and the Derivatives could have been prevented or severely diminished.

96.     As a result of Robinhood's conduct, Mr. LaPlant, and the Class, lost out on earning opportunities in GME, AMC, and BB, was damaged in the Securities and Derivatives that he held and/or was prevented from mitigating losses in those Securities and Derivatives.

97.     As a result of Robinhood's conduct, Mr. Gossett, and the Class, lost out

on earning opportunities in GME and AMC, was damaged in the Securities and the Derivatives that he held and/or was prevented from mitigating losses in those Securities and the Derivatives.

98.     As a result of Robinhood's conduct, Ms. Perrault, and the Class, lost out on earning opportunities in GME, AMC and NOK, was damaged in the Securities and the Derivatives that she held and/or was prevented from mitigating losses in those Securities and the Derivatives.

99.     As a result of Robinhood's conduct, Mr. Scarborough, and the Class, lost out on earning opportunities in GME, AMC, and NOK, was damaged in the Securities and the Derivatives that he held and/or was prevented from mitigating losses in those Securities and the Derivatives.

100.    AS a result of Robinhood's conduct, Mr. Schiller, and the Class, lost out on earning opportunities in AAL, and was damages in the Securities and the Derivatives that he, and other similarly situated, held and/or was prevented from mitigating losses.

VI.    **ROBINHOOD ENGAGED IN ITS CONDUCT IN ORDER TO PROTECT AND FURTHER INTERESTS IN CONFLICT WITH THE INTERESTS OF ITS CLIENTS**

101.    Robinhood imposed the Robinhood Trading Restrictions, and continued with the Modified Robinhood Trading Restrictions, with the specific, deliberate and malicious intent to advance and protect its own financial and other interests at the expense and sacrifice of the interests of its clients, including without limitation the Plaintiffs.

102.    Further, or in the alternative, Robinhood imposed the Robinhood Trading Restrictions, and continued with the Modified Robinhood Trading Restrictions, with the specific, deliberate and malicious intent to advance and protect the interests of other companies and financial institutions at the expense and sacrifice of the interests of its clients including, without limitation, the Plaintiffs. Those other companies and financial institutions include, among others, investors and equity holders in Robinhood, and financial institutions, organizations and companies (such as hedge funds), some or

FIRST AMENDED CLASS ACTION COMPLAINT

all of whom had an interest in the price of the Securities being devalued because they had taken large "short" positions in respect of the Securities among other reasons.

103.   Robinhood's conduct as alleged herein, including without limitation imposing the Robinhood Trading Restrictions, and continuing with the Modified Robinhood Trading Restrictions was and is in contravention of FINRA Rule 5310.

VII.   **ROBINHOOD HAS FAILED TO MAINTAIN CONSISTENT REASONS FOR ITS CONDUCT**

104.   On January 28, 20201, Robinhood's CEO, Vladimir Tenev, rushed to hold a damage control interview on CNBC's *Squawk Box*, during which he averred that the Robinhood Trading Restrictions were "pre-emptive." What exactly Robinhood was attempting to "pre-empt" is yet to be determined and was not explained by Mr. Tenev.

105.   Also, during this interview, Mr. Tenev averred that the Robinhood Trading Restrictions were not as a result of any liquidity concern or deficiency within the Company.

106.   Then, in a publicly disseminated discussion with Elon Musk on the night of January 31, 2021, Mr. Tenev came up with a new explanation for the suddenly imposed Robinhood Trading Restrictions, being that in the early morning of January 28, 2021, NSCC requested, initially, a $3 billion collateral deposit from Robinhood, and then a $1.4 billion collateral deposit before finally settling on $700 million provided that Robinhood impose the Robinhood Trading Restrictions.

107.   However, based on information and belief, Robinhood has been able to raise $3.4 billion in capital in less than 1 (one) week since it imposed the Robinhood Trading Restrictions, suggesting that Robinhood could have quickly averted any disruption to the market for the Securities and the Derivatives, or imposition of the Robinhood Trading Restrictions or the Modified the Robinhood Trading Restrictions, had it desired.

//

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
### (Against All Defendants; and DOES 1-10)

108.   Plaintiffs hereby reallege and incorporate by reference Paragraphs 1 through 107 of this Complaint as though fully set forth herein.

109.   Plaintiffs each entered into a contract with Defendants pursuant to which Defendants agreed to make the Robinhood trading platform, and the services associated therewith, available to Plaintiffs in order to carry out market trading, including without limitation the purchase and sale of securities such as stocks, options and futures ("Customer Agreement").

110.   The Customer Agreement obligates Robinhood to execute the Plaintiffs orders from their accounts and have those transactions cleared.

111.   The Customer Agreement expressly provides that:

> All orders for the purchase of Securities given for My Account will be authorized by Me and executed in reliance on My promise that an actual purchase is intended.

> I understand that Robinhood Financial has entered into a clearing agreement with Robinhood Securities whereby Robinhood Financial will introduce my Account to Robinhood Securities, and Robinhood Securities will clear all transactions.

> If [Robinhood] [does] not complete a transaction to or from your Account on time or in the correct amount, according to our Agreement with you, we will be liable for your losses or damages.

112.   The Customer Agreement further provides that in the event Robinhood discontinued a client account or any services related thereto, that it would "immediately providing written notice" to its client.

113.   The Plaintiffs fulfilled their obligations under the Customer Agreement and adhered to the terms thereof. Further the Plaintiffs provided valuable consideration

FIRST AMENDED CLASS ACTION COMPLAINT

under the Customer Agreement including without the opportunity to earn rebates and access to private client trading data to sell to third parties.

114.   The Customer Agreement is a type of agreement known as "clickwrap" and contains standard terms drafted by Defendants which are not open to negotiation.

115.   The Customer Agreement specifically provides that it is governed by California law, "except to the extent governed by….FINRA Rules".

116.   Defendants breached the Customer Agreement with Plaintiffs by imposing the Robinhood Trading Restrictions and the Modified Robinhood Trading Restrictions and otherwise, from and after the morning of January 28, 2021, restricting its services on the Robinhood platform and preventing the ability to buy, or otherwise trade or take positions, involving the Securities and the Derivatives and by failing and refusing to clear Plaintiffs' trades in the Securities and Derivatives.

117.   Further, Defendants breached the Customer Agreement by acting in contravention of FINRA Rule 5130 as alleged above in this Complaint.

118.   As a direct and proximate result of the foregoing breaches of the Customer Agreement, Plaintiffs have been materially prejudiced and have sustained damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT (IMPLIED TERMS AND COVENANTS)**
**(Against All Defendants; and DOES 1-10)**

119.   Plaintiffs hereby reallege and incorporate by reference Paragraphs 1 through 118 of this Complaint as though fully set forth herein.

120.   In all of the circumstances surrounding and including the Agreement, the formation of the Agreement, the past history between Defendants and Plaintiffs regarding the use of the Robinhood platform for trading and the customs, norms and standards surrounding trading in stocks, options and futures, and as needed for the sake of the Customer Agreement's business efficacy, the Customer Agreement included

FIRST AMENDED CLASS ACTION COMPLAINT

certain implied terms and covenants ("Implied Terms").

121.   The Implied Terms included: (i) that Defendants would give Plaintiffs reasonable advanced notice or warning prior to taking any steps out of the ordinary and reasonable industry customs, norms and standards regarding brokerage accounts, including without limitation placing any blanket restrictions across its platform which would affect their accounts or their ability to trade from their accounts, (ii) that Defendants would give Plaintiffs reasonable advanced notice or warning upon Defendants being aware that Defendants would be taking any steps out of the reasonable and ordinary industry customs, norms and standards regarding brokerage accounts, including without limitation placing any blanket restrictions across its platform which would affect their accounts or their ability to trade from their accounts (iii) that Defendants would not take steps to interfere with the Plaintiffs' trading from their accounts for reasons not specifically related to their accounts, (iv) Defendants would not take any steps, or exercise any discretions, to deliberately harm and interfere with, or which Defendants reasonably knew would harm or interfere with, the interests of Plaintiffs, (v) that Defendants would not take any steps, or exercise any discretions, with the specific and deliberate intent of harming or sacrificing, or which Defendants reasonably knew would harm or sacrifice, the interests of Plaintiffs in order to prefer the interests of Defendants or others, (vi) that Defendants would not take any steps, or exercise any discretions, to deliberately manipulate, interfere with and/or harm, or which Defendants reasonably knew would manipulate, interfere with and/or harm, the operation of the market for, or the values and prices of, stocks and derivatives, in which Plaintiffs were trading or intended to trade, (vii) that the Defendants would not restrict the free trading in any particular stocks or derivatives, which were being freely traded by others in the public market and which were not the subject of a halt by the Securities Exchange Commission or any stock exchange; and (viii) that the Defendants would operate the Robinhood platform and provide its brokerage services in compliance with applicable licensing requirements, regulations and laws.

31

122.   Plaintiffs fulfilled their obligations under the Customer Agreement and adhered to the terms thereof. Further the Plaintiffs provided valuable consideration under the Customer Agreement including without limitation the opportunity to earn rebates and access to private client trading data to sell to third parties.

123.   The Customer Agreement is a type of agreement known as a "clickwrap" and its terms are not open to negotiation.

124.   Defendants drafted each and every term of the Customer Agreement.

125.   Defendants, a multi-billion dollar business, have vastly superior bargaining power compared to Plaintiffs.

126.   The Customer Agreement is a very lengthy and technical document laden with complicated legal terms and terminology regarding the securities market and the operation of Plaintiffs' account.

127.   Defendants, knew, or ought to have known, that Plaintiffs did not, or could not, fully understand or appreciate, and lacked the sophistication to fully understand or appreciate, the terms of the Customer Agreement including, without limitation, their rights thereunder.

128.   The Customer Agreement provides that compliance with its essential terms are optional for Defendants, yet mandatory for Plaintiffs.

129.   The Customer Agreement is procedurally and substantively unconscionable without the Implied Terms being a part thereof.

130.   The Defendants, by engaging in their conduct as alleged hereinabove, breached the Implied Terms of the Customer Agreement, and each of them.

131.   As a direct and proximate result of the foregoing breaches of the Implied Terms of the Customer Agreement, Plaintiffs have been materially prejudiced and have sustained damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
### BREACH OF IMPLIED COVENANT OF
### GOOD FAITH AND FAIR DEALING
### (Against All Defendants; and DOES 1-10)

132.   Plaintiffs hereby reallege and incorporate by reference Paragraphs 1 through 131 of this Complaint as though fully set forth herein.

133.   Plaintiffs fulfilled their obligations under the Customer Agreement and adhered to the terms thereof. Further, Plaintiffs provided valuable consideration under the Customer Agreement including, without limitation, , the opportunity to earn rebates and access to private client trading data to sell to third parties.

134.   Every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

135.   Defendants materially breached the covenant of good faith and fair dealing implied in the Customer Agreement as a matter of law, and unfairly and in bad faith interfered with the right to receive the benefit of the Customer Agreement by, among other things, failing to provide notice that certain critical account trading functions of Plaintiffs would be restricted, actually and in fact restricting such account functions, and knowingly undertaking certain acts that undermined the rights of Names Plaintiffs and the proposed Class under the Customer Agreement and their interests in the Securities and the Derivatives.

136.   Defendants breached the covenant of good faith and fair dealing implied in the Customer Agreement as a matter of law, and unfairly and in bad faith interfered with the right to receive the benefit of the Customer Agreement, by engaging in their conduct as alleged hereinabove, including without limitation by imposing the Robinhood Trading Restrictions and the Modified Robinhood Trading Restrictions.

137.   Plaintiffs expected that Defendants would use their best efforts to take

FIRST AMENDED CLASS ACTION COMPLAINT

actions in support of and to fulfill the terms of the Customer Agreement. The actions of Defendants as hereinbefore described, are in violation of the implied covenant of good faith and fair dealing and have caused Plaintiffs to suffer damages in an amount to be determined at trial.

138.   As a direct and proximate result of the foregoing breach, Plaintiffs have been materially prejudiced and have sustained damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE**
**(Against All Defendants; and DOES 1-10)**

139.   Plaintiffs hereby reallege and incorporate by reference Paragraphs 1 through 138 of this Complaint as though fully set forth herein.

140.   Defendants had a duty to exercise reasonable care in conducting and facilitating trading on behalf of its clients. Defendants had a duty to exercise reasonable care to facilitate, or otherwise permit, Plaintiffs to trade on their Robinhood accounts. Defendants had a duty to exercise reasonable care to refrain from taking steps which caused injury to the Plaintiffs in their trading activities and market positions.

141.   Further, Defendants had a duty to exercise reasonable care to give reasonable advance notice to, or warn, Plaintiffs that Defendants intended to impose, *inter alia*, the Robinhood Trading Restrictions that would cause injury to the Plaintiffs in their trading activities and market positions prior to taking such steps.

142.   Defendants had a duty to exercise reasonable care to monitor, supervise and oversee the operation of its financial services business in order to guard against foreseeable instances whereby Defendants would be pressured or required to undertake actions which would cause injury to the Plaintiffs in the manner alleged hereinabove.

143.   Defendants had a duty to exercise reasonable care to monitor, supervise and oversee its financial affairs including, without limitation, its collateral requirements, so that its business could continue to operate in line with the foreseeable and actual volume and volatility of trading being undertaken by its clients on its

34

platform.

144.   Defendants, by engaging in their conduct as alleged hereinabove, breached their duties to exercise reasonable care as described hereinabove.

145.   Plaintiffs were harmed as a result.

146.   Defendants' negligence was a substantial factor in causing Plaintiffs' harm.

147.   As a direct and proximate result of the foregoing breach, Plaintiffs have been materially prejudiced and have sustained damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY
### (Against All Defendants; and DOES 1-10)

148.   Plaintiffs hereby re-allege and incorporate by reference Paragraphs 1 through 147 of this Complaint as though fully set forth herein.

149.   A fiduciary duty arises by and between parties to a transaction, wherein one of the parties is duty bound to act with the utmost good faith and for the benefit of the other party. Plaintiffs voluntarily, and at significant enticement from Defendants through targeted marketing activity on the Site, reposed their trust and confidence in Robinhood to execute their trades and to allow access to the capabilities that the App purports to extend.

150.   Plaintiffs allege that in all of the circumstances surrounding and concerning the dealings and relationship between the Plaintiffs and the Defendants, Plaintiffs entrusted Defendants with, among other things, their trades and market orders with respect to the Securities and the Derivatives, among others.

151.   Defendants' disregarded their duties to Plaintiffs by, *inter alia*, bartering and sacrificing their clients' ability to freely trade in exchange for more lenient clearinghouse deposit requirements.

152.   Plaintiffs allege that, at all times herein mentioned, Defendants owed

fiduciary duties including, without limitation, the duties of loyalty, to make full material disclosure, to exercise reasonable care, good faith, and to avoid choosing conflicting interests over that of its clients. Plaintiffs further alleges that Defendants breached their fiduciary duties to Plaintiffs by participating in and facilitating improper and unlawful actions, or omissions, and otherwise engaging in their conduct, as alleged hereinabove.

153.   At all times relevant herein mentioned, Defendants failed to act loyally, to make full material disclosure, in good faith or in the best interests of Plaintiffs.

154.   Plaintiffs were harmed as a result.

155.   Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

156.   As a direct and proximate result of Defendants breaching their fiduciary duties, Plaintiffs have been materially prejudiced and have sustained damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
## FALSE PROMISE
### (Against All Defendants; and DOES 1-10)

157.   Plaintiffs hereby reallege and incorporate by reference Paragraphs 1 through 156 of this Complaint as though fully set forth herein.

158.   Defendants allowed Plaintiffs to continue trading and taking positions in the Securities and the Derivatives through their Robinhood accounts up until the morning of January 28, 2021 regardless of the high volume of trading in the Securities and the Derivatives and regardless of the increased volatility in the foregoing. Defendants further allowed such trading, albeit only for a brief period, despite knowing that they would be implementing the Robinhood Trading Restrictions without any warning to Plaintiffs, and without regard for the fact that such actions would harm and injure Plaintiffs.

159.   Indeed, there was extensive publicity through the media and on the

FIRST AMENDED CLASS ACTION COMPLAINT

Internet about the volume and prices at which the Securities and the Derivatives were trading. Nonetheless, and despite that publicity, Defendants continued to allow trading and taking positions in the Securities and the Derivatives as they had always done in the past and as was required under the Customer Agreement. As such, the Defendants' conduct in this regard constituted a continuing promise made to Plaintiffs that they could continue to trade and take positions in the Securities and their derivatives (the "Promise").

160.   At some point prior to January 28, 2021, the full particulars of which are known to Defendants and not to Plaintiffs, Defendants decided that they would, might or would likely place restrictions on Robinhood's clients regarding trading or taking positions in the Securities and the Derivatives as pleaded above in this Complaint, such that Defendants did not intend on performing the Promise, which Defendants continued to make.

161.   Defendants intended Plaintiffs to rely on the Promise so that Defendants could continue to earn fees, rebates  and collect valuable data by Plaintiffs continuing to trade or take positions in the Securities and the Derivatives.

162.   Plaintiffs reasonably relied on the Promise and traded or took positions in the Securities and the Derivatives, and did not take profits, suffered losses and/or did not take steps to minimize losses prior to the morning of January 28, 2021.

163.   Defendants did not perform the Promise by engaging in their conduct as pleaded above in this Complaint.

164.   Plaintiffs were harmed as a result.

165.   Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

166.   As a direct and proximate result of Defendants failure to perform the Promise, Plaintiffs have been materially prejudiced and have sustained damages in an amount to be proven at trial.

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SEVENTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### (Against All Defendants; and DOES 1-10)

167.   Plaintiffs hereby reallege and incorporate by reference Paragraphs 1 through 166 of this Complaint as though fully set forth herein.

168.   Robinhood represented to the Plaintiffs as true that its new clearing system would help it "move faster," would give Robinhood "complete control over giving you the best experience out there!", and give Robinhood the ability to offer "better customer support and quicker responses" among other representations that its new clearing system was an improvement over its use of Apex as a clearing broker ("Robinhood Clearing Representations").

169.   The Robinhood Clearing Representations were not true.

170.   Robinhood had no reasonable grounds for believing that the Robinhood Clearing Representations were true including, without limitation, because Robinhood was aware of its liquidity and level of capitalization and that Apex had vastly greater amounts of segregated funds for regulatory and clearing purposes.

171.   Robinhood intended that Plaintiffs rely on the Robinhood Clearing Representations, which were made to make Robinhood clients believe that Robinhood was operating its business and managing its financial obligations such that it was a reliable platform for its brokerage services.

172.   Plaintiffs relied on the Robinhood Clearing Representations.

173.   Plaintiffs were harmed as a result.

174.   Defendants' conduct was a substantial factor in causing Plaintiffs' harm

175.   As a direct and proximate result of Defendants negligent misrepresentations, Plaintiffs have been materially prejudiced and have sustained damages in an amount to be proven at trial.

//

FIRST AMENDED CLASS ACTION COMPLAINT

**EIGHTH CAUSE OF ACTION**
**UNLAWFUL BUSINESS PRACTICES**
**(CAL. BUS. & PROF. CODE § 17200, *et seq*.)**
**(Against All Defendants; and DOES 1-10  )**

176.    Plaintiffs hereby reallege incorporate by reference Paragraphs 1 through 175 of this Complaint as though fully set forth herein.

177.    By the engaging in the conduct pleaded above in this Complaint, Defendants have engaged in an unlawful and unfair business acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq*.

178.    Plaintiffs were harmed as a result.

179.    Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

180.    As a direct and proximate result of Defendants unfair and unlawful business acts or practices, Plaintiffs have been materially prejudiced and have sustained damages in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**
**(VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER)**
**(Against All Defendants; and DOES 1-10)**

181.    Plaintiffs hereby reallege and incorporate by reference Paragraphs 1 through 180 of this Complaint as though fully set forth herein.

182.    SEC Rule 10b-5 provides as follows:

"Rule 10b-5: Employment of Manipulative and Deceptive Practices":

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

39

1       in connection with the purchase or sale of any security."

2

3     183.    By engaging in their conduct as pleaded hereinabove, Defendants violated

4 SEC Rule 10b-5.

5     184.    Defendants, individually and in concert with one another: (a) premeditated

6 and deployed a scheme and artifice to defraud Plaintiffs, who are, and at all relevant

7 times were, members of the investing public; (b) made untrue statements of material

8 fact including, without limitation, about their liquidity and ability to cover trades

9 through their internal clearing department; and (c) omitted material facts in order

10 deceive Plaintiffs and the investing public, and to create the false impression amongst

11 Plaintiffs that their statements were not misleading.

12     185.    Defendants acted with scienter, intentionally, taking the steps it did,

13 including without limitation any material statements made or omitted by Defendants to

14 the public or its clients, and avoiding taking other available steps, in order to deflate

15 the value of the Securities as pleaded above in this complaint, in order to defraud or

16 deceive the Plaintiffs and other members of the Class. Defendants acted with

17 knowledge, recklessly and purposely.

18     186.    Defendants conduct and material statements made or omitted as pleaded

19 above in this complaint were material to the Plaintiffs, including without limitation by

20 having actual significance in the deliberations of Plaintiffs because such conduct and

21 material statements and omissions significantly altered the total mix of information

22 available to the Plaintiffs in making their decisions concerning trading involving the

23 Securities.

24     187.    Plaintiffs were buyers and/or sellers of the Securities.

25     188.    As a direct and proximate result of Defendants breach and violation of

26 SEC Rule 10b-5, Plaintiffs have been materially prejudiced and have sustained

27 damages in an amount to be proven at trial.

28

FIRST AMENDED CLASS ACTION COMPLAINT

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.   For compensatory damages, in an amount according to proof;

2.   For consequential damages, in an amount according to proof;

3.   For restitution of all wrongfully acquired amounts and disgorgement of all ill-gotten profits, in an amount according to proof;

4.   For a declaration that the Customer Agreement is unenforceable due to unconscionability;

5.   For all statutory penalties authorized by law;

6.   For punitive and/or exemplary damages in an amount sufficient to punish Defendants for the wrongful conduct alleged herein and to deter such conduct in the future;

7.   For Plaintiffs' reasonable attorneys' fees and costs pursuant to all applicable provisions of law;

8.   For all costs of suit incurred herein;

9.   For prejudgment and post judgment interest at the maximum legal rate; and

10.  For such other relief as the Court may deem proper.

Dated: February 4, 2021                    **PESSAH LAW GROUP, PC**


By: _/s/ Maurice D. Pessah_
    Maurice D. Pessah
    Michael Morris-Nussbaum
    Summer E. Benson
    Attorneys for Plaintiffs
    and the Class

FIRST AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CHELIN LAW FIRM**


By: */s/ Stuart N. Chelin*
 Stuart Chelin
 Attorneys for Plaintiffs
 and the Class

FIRST AMENDED CLASS ACTION COMPLAINT

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand a trial by jury.


Dated: February 4, 2021                              **PESSAH LAW GROUP, PC**



By: *<u>/s/ Maurice D. Pessah</u>*
     Maurice D. Pessah
     Michael Morris-Nussbaum
     Summer E. Benson
     Stuart Chelin
     Attorneys for Plaintiffs and the Class

FIRST AMENDED CLASS ACTION COMPLAINT